Eric Stephenson (9779)
STEPHENSON LAW FIRM
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (844) 529-2112
Facsimile: (801) 906-5799
Email: eric@utahjustice.com

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| DAVID SEXTON,<br><br>    Plaintiff,<br><br>vs.<br><br>POULSEN AND SKOUSEN P.C.;<br>ROBERT POULSEN; EVERGREEN<br>VILLAGE MHC, LLC; ROBERT J.<br>REITZ, SALT LAKE COUNTY<br>CONSTABLE; DALE HITESMAN;<br>AND JOHN AND JANE DOES 1-5,<br><br>    Defendants. | **COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

## JURISDICTION AND VENUE

1. This action arises from Defendants' violations of the Fair Debt Collection Practices Act (FDCPA) 15 U.S.C. § 1692, *et seq.*, and the Utah Consumer Sales Practices Act (UCSPA) Utah Code Ann. § 13-11-1 *et seq*., by the Defendants in their deceptive and illegal efforts to collect a consumer debt.

2. Jurisdiction in this case is founded upon 28 U.S.C. § 1331, § 1367, and 15 U.S.C. § 1692k, which grant the United States District Courts jurisdiction to hear this action without regard to the amount in controversy.

3.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving rise to Plaintiff's claims occurred within this federal judicial district and because the Defendants conduct business and reside in the State of Utah within the meaning of 28 U.S.C. § 1391(b) and (c).

4.   This Court has personal jurisdiction over the Defendants in this case because they have continuous and systematic contacts with the State of Utah including, but not limited to, residing in Utah, conducting business in Utah, practicing law in Utah, regularly collecting or attempting to collect debt from Utah consumers, regularly evicting Utah consumers, regularly defrauding Utah consumers out of their property, regularly depriving Utah consumer of their legal rights, regularly enforcing agreements with Utah consumers, regularly entering into agreements with Utah consumers, regularly contacting consumers in Utah by telephone, email, mail, and other instruments of interstate commerce, and by availing themselves of the benefits of the Utah judicial system.

<u>PARTIES</u>

5.   The Plaintiff David Sexton is a natural person who resides in Utah. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) and a "person" as defined in Utah Code Ann. § 13-11-3(5) and was directly harmed by the Defendants' conduct and violations complained of herein.

6.   Defendant Poulsen and Skousen P.C. , is a law firm regularly conducting business and collecting debts in the State of Utah and is a "debt collector" as that term is defined by 15

U.S.C. § 1692a(6). Its principle place of business is located at 1108 West South Jordan Parkway, Unit D, South Jordan, Utah 84095.

7.   Defendant Robert Poulsen, is a natural person regularly conducting business in the State of Utah as a licensed attorney and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6). His principle place of business is located at 1108 West South Jordan Parkway, Unit D, South Jordan, Utah 84095.

8.   Defendant Evergreen Village MHC, LLC, is a foreign corporation conducting business in Utah at 2491 US-89, Pleasant View, UT 84404.

9.   Defendant Robert J. Reitz, Salt Lake County Constable, is a company conducting business in Utah and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6). Its principle place of business is located at 7026 South Commerce Park Drive #101, Midvale, Utah 84047.

10.  Defendant Dale Hitesman is a natural person and a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6). His principle place of business is located at 7026 South Commerce Park Drive #101, Midvale, Utah 84047.

11.  The John Doe and Jane Doe Defendants are natural persons residing in Utah whose identities are currently unknown. These Defendants controlled, contributed to, participated in, approved of, or ratified the conduct of the other Defendants complained of herein.

12.  At all times relevant to this case, the Defendants were each a "person" as defined in Utah Code Ann. § 13-11-3(5), and a "supplier" as defined in Utah Code Ann. § 13-11-3(6).

3

13. Among the Poulsen Defendants' (Poulsen and Skousen P.C. and Robert Poulsen) regular and principle business purposes is assisting others in the collection and enforcement of past due debts incurred for personal, family, or household purposes and originally owed or due to another.

14. The Constable Defendants' (Robert J. Reitz, Salt Lake County Constable and Dale Hitesman) regular and principle business purpose is assisting others in the collection and enforcement of past due debts incurred for personal, family, or household purposes and originally owed or due to another.

15. Each of the Poulsen and Constable Defendants regularly collect or attempt to collect or enforce, directly or indirectly, debts owed or due or asserted to be owed or due another.

16. The Poulsen and Constable Defendants' collection efforts include, *inter alia*, communicating with Utah residents by telephone, entering into agreements with Utah consumers, enforcing agreements with Utah consumers, evicting Utah consumers from their homes, mailing letters to Utah residents, engaging in personal communications with and about Utah consumers, threatening Utah consumers with arrest, eviction, garnishment, asset seizures, and other actions, and filing or threatening to file lawsuits in Utah.

17. During the course of their efforts to regularly collect past due debt originally owed or due to another, the Poulsen and Constable Defendants used various instrumentalities of interstate commerce such as mail, telephone, Internet, and electronic mail.

FACTUAL ALLEGATIONS

18. On January 25, 2008, Plaintiff and Defendant Evergreen Village entered into a lease agreement providing for Sexton to pay rent for a mobile home lot at the rate of $352.00 per month.

19. Upon information and belief, Plaintiff has never signed any other lease with Evergreen.

20. Upon information and belief, Evergreen increased Sexton's rent at various times during his tenancy even though it did not enter into any new written agreements with Sexton.

21. At all times relevant to this case Sexton owned the home he placed on Evergreen's lot.

22. Sexton never abandoned the home he placed on Evergreen's lot.

23. Evergreen never owned or had any legal right to possess or sell Sexton's home.

24. At all times relevant to this case, it was unlawful for Defendants to exclude Sexton from his home in any manner except by judicial process under Utah Code Ann. § 78B-6-814.

25. Sexton was never guilty of unlawful detainer under Utah Code Ann. § 78B-6-802 since none of the provisions of that section applied.

26. On March 17, 2017, Defendants gave Sexton three Landlord's Seven Day Rule Violation Notices that accused Sexton of violating certain rules and represented Sexton had seven days to cure those violations. Sexton received and read those three notices.

27. Simultaneously, Defendants gave Sexton three Landlord's Immediate Notices of Lease Termination for Endangerment that terminated Sexton's lease and commanded Sexton to immediately vacate the premises. Sexton received and read those three notices.

5

28. Because the Landlord's Seven Day Rule Violation Notices represented that Sexton had a seven day cure period but the Landlord's Immediate Notices of Lease Termination required Sexton to immediately vacate the premises, Sexton was confused about which one applied and what rights he had to cure the violations and stay in his home.

29. The Defendants' notices contradicted each other. The Landlord's Seven Day Rule Violation Notices represented Sexton had a right to dispute the occurrences of claimed noncompliance and that he had a right to require Evergreen to participate in a meeting to attempt to resolve the dispute while the Landlord's Immediate Notices of Lease Termination represented Sexton was required to vacate immediately instead.

30. The Defendants' notices also contradicted each other because the Landlord's Seven Day Rule Violation Notices represented that Sexton had a right to cure the alleged noncompliance and remain in his home but the Landlord's Immediate Notices of Lease Termination represented that he was required to vacate immediately instead.

31. Defendants represented in their Notices of Lease Termination that Sexton committed the crime of "Resident's dog attacking person(s)."

32. Sexton was not the owner or caretaker of the dog discussed in Defendants' notices and he was never charged with any crime related to the attacks referenced therein.

33. The Landlord's Seven Day Rule Violation Notices and the Landlord's Immediate Notices of Lease Termination contained other confusing, deceptive, and conflicting representations that were confusing and deceptive to Sexton and would be confusing and deceptive to the least sophisticated consumer.

6

34. On or around May 9, 2017, the Poulsen Defendants filed a lawsuit on behalf of Defendant Evergreen Village and against Sexton demanding his immediate eviction and payment of past due rent, treble damages, attorney's fees, costs, and other similar relief. Sexton received and read the lawsuit documents.

35. Upon information and belief, the Poulsen Defendants and Evergreen proceeded against Sexton under Utah Code Ann. § 57-16-5(1)(c) instead of § 57-16-5(1)(a) to deprive Sexton of his right to cure his noncompliance, if any existed at all.

36. In their Complaint, the Poulsen Defendants and Evergreen knowingly made false and deceptive representations, including, among others;

    a. that Sexton failed to cure the supposed violations and breached the lease agreement even though he did not,

    b. that Sexton endangered other persons or property even though he did not endanger anyone and did not own or control the dog at issue,

    c. that Sexton owed an unspecified amount for service charges and other fees he did not owe,

    d. that Sexton was guilty of unlawful detainer even though he was not, and

    e. that Sexton owed treble damages starting on March 23, 2017 even though he never unlawfully detained the property.

37. After receiving and reading the Summons and Complaint, at least one of the John or Jane Doe Defendants who were employed as management for Evergreen Village represented to

Sexton that as long as he no longer allowed the dog at issue on the property Evergreen would stop the eviction.

38.  Upon information and belief, those representations were made by the John or Jane Doe Defendants on Evergreen's behalf for the purpose of deceiving Sexton so he would not defend the lawsuit against him.

39.  Sexton reasonably relied on John or Jane Does' representations and did not submit an answer to the Complaint as a result of those representations.

40.  Defendants then requested and received a default judgment against Sexton.

41.  In their Statement in Support of Default Judgment the Defendants knowingly falsely asserted that;

   a.  Sexton threatened or endangered other persons or property in the community even though they knew he did not,

   b.  Sexton breached the terms of his lease even though they knew he did not, and

   c.  Sexton should be assessed treble damages for being in wrongful detainer of the property starting on March 23, 2017 when they knew he was not.

42.  On May 31, 2017, the court entered the requested default judgment against Sexton. That judgment terminated the lease agreement between the parties and ordered Sexton to pay $3,764.90 plus $46.10 per day until he restored the lot to Evergreen.

43.  The court simultaneously entered an Order of Restitution requiring Sexton to remove his personal property and restore possession of the premises to Evergreen within 15 days.

8

44. Less than three hours later, the Poulsen Defendants sent the Constable Defendants to Sexton's home to deliver the Order of Restitution on behalf of Evergreen.

45. On June 16, 2017, the Constable Defendants and several of the John or Jane Doe Defendants went to Sexton's home and took the following actions on behalf of the Poulsen and Evergreen Defendants:

   a.  ordered Sexton's son and the other occupants to immediately leave the home,

   b.  represented that Sexton and his son were no longer allowed to enter their home,

   c.  represented that Sexton no longer owned the home because it belonged to Evergreen as a result of the court's order,

   d.  threatened to have the Sextons arrested if they returned to the property for any reason,

   e.  forcibly entered the home unlawfully to take pictures and an inventory of its contents, and

   f.  changed the locks on Sexton's home so he and his family could not enter.

46. The Order of Restitution entered by the court did not grant Defendants any rights to possess, occupy, or sell Sexton's home and it did not deprive Sexton of his rights of ownership, possession, or control.

47. The Order of Restitution did not grant Defendants any rights to enter the home, change the locks, or to photograph or take inventory of the contents of the home.

48. Instead, the Order of Restitution granted Sexton 15 days to remove his personal property and restore possession of the premises to Evergreen.

49. Sexton and his son had 15 days as a matter of law to request a hearing but they were unaware of that legal right because Defendants did not provide the required notice of a request for hearing forms.

50. The Sextons were deceived, frightened, and humiliated by Defendants false representations and illegal threats and demands so they complied with those demands and left their home immediately as ordered.

51. The Sexton's were ready, willing, and able to comply with the Order of Restitution but were prevented from doing so by Defendants' false representations and unlawful threats to arrest the Sexton's if they tried to do so.

52. Defendants changed the locks on the Sextons' home to deny them entry and possession and to prevent the Sextons from removing their property.

53. Even though the Defendants had already changed the locks, on June 19, 2017, the Poulsen and Evergreen Defendants filed a Praecipe with the court and requested a Writ of Execution directing the sheriff or constable to change the locks on Sexton's home and to remove and sell any personal property contained therein, including the home itself.

54. Later that day, the court granted the Writ of Execution that granted Evergreen the right to execute enough of Sexton's non-exempt property to satisfy the judgment.

55. The Writ of Execution did not grant any right to execute on Sexton's exempt property.

56. The Poulsen and Evergreen Defendants knowingly made several falsely and deceptive representations in their Application for a Writ of Execution, including the representations that:

10

a. Defendants were entitled to seize Sextons home even though they knew it was not lawful for them to seize the home,

b. that Sextons home was worth an estimated $1,000.00 when they knew it was worth substantially more,

c. that they knew of no person to claim an interest in Sexton's home even though they knew Sexton and his son both claimed an interest in the home.

57. On June 22, 2017, the court clerk entered an order for a Writ of Execution against Sexton's nonexempt property.

58. The court never entered an order allowing for execution of Sexton's exempt property.

59. Even though the court never entered an order permitting the seizure of Sexton's exempt property, the Defendants scheduled and began publically advertising a constable's sale to sell Sexton's home. That sale was scheduled to occur on July 11, 2017.

60. On July 5, 2017, Sexton objected to the Writ of Execution and filed a Homestead Declaration as most, if not all, of the property the Defendants seized was exempt under Utah law.

61. After Defendants received notice that Sexton's home was exempt from seizure under Utah law, Defendants continued advertising Sexton's home for sale.

62. It was only after the court ordered Defendants to cease any further efforts to sell the home that the Defendants finally cancelled the July 11, 2017 sale.

63. Sexton—no longer allowed to live in his home and ordered by the court to remove it from the premises—found a buyer to purchase his home for $18,000.00.

11

64. Despite the court's order and after receiving notice Sexton's home was exempt from seizure, Defendants continued to represent that they had the right to keep the Writ of Execution intact and continued depriving Sexton of the rights to remove, sell, or reside in his home.

65. Despite the court's order and after receiving notice Sexton's home was exempt from seizure, Defendants refused to remove the locks they placed on the Defendant's home.

66. When the buyer of Sexton's home arrived to take possession of his purchase, the Defendants—accompanied by two Pleasant View police officers—forcibly prevented him from doing so and threatened to arrest him if he did not leave his home on the premises.

67. The Defendants never had legal authority to arrest or facilitate an arrest of anyone for trying to remove Sexton's home.

68. On the contrary, Defendants were prohibited from interfering with or seizing Sexton's home as a matter of law since they were all on notice Sexton's home was exempt from execution under Utah Code § 78B-5-503.

69. On August 8, 2017, Sexton's attorney attempted to communicate with the Poulsen Defendants to facilitate the sale and removal of Sexton's home from Evergreen's premises and obtain a payoff amount for the debt but the Defendants refused to respond.

70. Sexton's attorney attempted on multiple occasions to contact the Poulsen Defendants over the next week and a half to facilitate the sale and removal of Sexton's home from Evergreen's premises but the Poulsen Defendants continually refused to respond.

71. On August 17, 2017, Sexton's father Marvin Sexton tendered a check to the Poulsen Defendants in the amount of $3,764.90. Sexton was also ready, willing, and able to pay for any additional amounts needed to fully satisfy the judgment.

72. On behalf of Evergreen, the Poulsen Defendants refused to accept Sexton's $3,764.90 tender of payment and refused to provide an amount needed to fully pay the judgment.

73. On August 17, 2017, Sexton's attorney attempted to communicate with the Poulsen Defendants to obtain a payoff amount but they refused to respond.

74. At various other times relevant to this case, Sexton's attorney made telephone calls to communicate with Poulsen Defendants but they refused to respond to those calls.

75. On August 17, 2017, Sexton filed a Motion for Satisfaction with the court on the basis that the Defendants refused to accept the tendered payment and refused to provide a payoff amount.

76. On August 22, 2017, the Poulsen Defendants filed an objection to that motion on Evergreen's behalf  and in that objection falsely represented;

    a.  that Sexton's home was attached by the Writ of Execution even though it was not attached and could not be attached as a matter of law since the home was exempt and notice of that exemption had been received by Defendants,

    b.  that Sexton was prohibited by the Writ of Execution from disposing of his home even though he was not, and could not be, prohibited in any way from disposing of his home as it is exempt from attachment as a matter of law,

    c.  that Sexton engaged in a fraudulent transaction when he did not,

13

    d.   that Sexton could not deliver clear title to his home even though he could,

    e.   that Sexton violated the court's Writ of Execution when he did not,

    f.   that Sexton's tender of payment came from the proceeds of a fraudulent sale when they did not,

    g.   that the Defendants could not accept Sexton's tender of payment when it could,

    h.   that Sexton's father did not offer to satisfy the full judgment even though he did,

    i.   that Sexton was required to relinquish his property even though he was not, and

    j.   that Sexton violated the terms of an agreement to restrain him from selling his home even though that agreement was illegal and unconscionable on its face.

77.  Sexton did not engage in a fraudulent transaction or violate the court's Writ of Execution.

78.  The Writ of Execution did not impede Sexton from disposing of his home in any manner.

79.  At all times relevant to this case Sexton's home was exempt from execution by law.

80.  As of September 6, 2017, Defendants did not provide Sexton or his attorney with an amount needed to pay off the debt.

81.  Although Sexton had a right to cure any violations, Defendants never gave Sexton a right to cure and instead intentionally acted in concert with each other to deprive Sexton of that right by their representations and conduct discussed herein.

82.  Although Sexton had a right to pay the judgment against him, Defendants intentionally deprived Sexton of that right by their representations and conduct discussed herein.

83.  Upon information and belief, Defendants intentionally refused to accept tender of payment and to provide a payoff amount for the debt so Sexton would continue to incur charges of

$46.10 per day which would increase the amounts Sexton would be required to pay until he would be forced to surrender his home to them.

84. But for Defendants' conduct, Defendants would have received payment in full for the debt no later than August 21, 2017 and the premises would have been restored at least one month earlier.

85. The debt Defendants sought to collect was primarily for personal, family, or household purposes and is therefore "debt" as defined by 15 U.S.C. § 1692a(5) and a "consumer transaction" as defined by Utah Code Ann. § 13-11-3(2).

86. The letters, legal documents, in-person contacts, advertisements, emails, and telephone calls the Defendants had with the Plaintiff, his son, his attorney, the general public, with each other, and with the court are "communications" as defined in 15 U.S.C. § 1692a(2).

87. None of the written communications the Defendants had with Sexton included the notifications or disclosures set forth under 15 U.S.C. § 1692g or 15 U.S.C. § 1692e(11).

88. All the Defendants conduct discussed herein was a collection or attempt to collect a debt.

89. The conduct, actions, and omissions by which the Defendants collected the alleged debt caused Plaintiffs damages as described herein and were violations of numerous and multiple provisions of the FDCPA, including, but not limited to; 1692c(b), 1692d, 1692d(1), 1692d(4), 1692e, 1692e(1), 1692e(2)(A), 1692e(2)(B), 1692e(4), 1692e(5), 1692e(6), 1692e(7), 1692e(10), 1692e(11), 1692e(15), 1692f, 1692f(1), 1692f(6) and 1692(g), amongst others.

90. The Defendants' actions, omissions, and communications discussed herein are consumer transactions or occurred as part of a consumer transaction under the Utah Consumer Sales Practices Act.

91. The conduct, actions, and omissions by which Defendants conducted business, enforced the agreement, communicated with others, and collected the debt caused Plaintiff damages as described herein and violated numerous and multiple provisions of the UCSPA, including but not limited to, Utah Code Ann. §§ 13-11-4 and 13-11-5.

92. The actions, omissions, and communications of the Defendants as discussed herein that violated the FDCPA and the UCSPA would have misled the least sophisticated consumer or any person of average intelligence.

93. The actions, omissions, and communications of the Defendants discussed herein that violated the FDCPA and the UCSPA actually deceived Plaintiff who reasonably relied on those actions, omissions, and communications.

94. Plaintiff suffered concrete and actual damages as a result of Defendants' deceptive, unfair, unlawful, and unconscionable representations and efforts to collect the alleged debt, including, among other things; legal fees, emotional distress, humiliation, stress, anxiety, confusion, headaches, chest pain, nausea, difficulty concentrating, sleeplessness, enduring needless and vexatious litigation, being threatened with the illegal foreclosure and sale of his home, being threatened with arrest, being falsely accused of criminal behavior, being forcibly removed from his home, being charged with amounts that he did not agree to pay and that were not authorized by the agreement creating the debt or otherwise permitted by

16

law, and being subjected to conduct in direct contravention to Utah law, his legal rights, and to the court's rulings.

95. At all times relevant to this lawsuit, Plaintiff used reasonable care and diligence in an effort to minimize and avoid the damages caused by the Defendants' conduct.

96. On the other hand, Defendants were negligent in their conduct and, upon information and belief, took no action whatsoever to minimize or avoid the damages they caused.

97. Indeed, Defendants' conduct was malicious and unlawful and, upon information and belief, taken for the purpose of increasing the damages to Plaintiff or to deprive Plaintiff of his legal rights.

98. Defendants had a duty to collect only amounts that were reasonable and actually and legally owed but Defendants negligently, or in the alternative, intentionally breached that duty.

99. Defendants had a duty to disclose all material information but negligently, or in the alternative, intentionally breached that duty.

100. Defendants had a duty to adhere to all the requirements and refrain from violating all of the prohibitions provided for by the FDCPA and UCSPA but Defendants negligently, or in the alternative, intentionally breached that duty.

101. Defendants had a duty to treat Sexton, his family, and his buyer with truth, dignity, fairness, and respect but negligently, or in the alternative, intentionally breached that duty.

102. Upon information and belief, Plaintiff's damages as discussed herein were also the direct and proximate result of Defendants' willful and malicious or intentionally fraudulent

17

conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of the Plaintiff.

103. Upon information and belief, the Defendants' representations, threats, communications, and other conduct in this case was for the purpose of vexing and harassing Sexton and his son and to deprive them of the use, possession, and ownership of their home.

104. Upon information and belief, the Defendants each participated in, authorized, directed, controlled, or ratified the conduct of the other Defendants complained of herein.

105. Upon information and belief, none of the Defendants or their agents were ever reprimanded, terminated, or otherwise disciplined for their conduct complained of herein.

<u>COUNT I</u>
**Fair Debt Collection Practices Act**

106. Plaintiff hereby incorporates all other allegations set forth in this Complaint.

107. The FDCPA was enacted to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

108. "The FDCPA is a remedial statute aimed at curbing what Congress considered to be an industry-wide pattern of and propensity towards abusing debtors." *Clark v. Capital Credit & Collection Services, Inc*., 460 F.3d 1162, 1171 (9th Cir.2006). It prohibits, and imposes strict liability and both statutory and actual damages for, a wide range of abusive and unfair practices. *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010).

18

109. In connection with the collection of the alleged debt, the actions, omissions, communications, and representations by the Poulsen and Constable Defendants as discussed herein constitute numerous and multiple violations of the FDCPA against the Plaintiffs including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 *et seq*.

110. Each of the Poulsen and Constable Defendants' violations of the Utah Consumer Sales Practices Act as set forth below also constitute violations of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 *et seq*.

111. As a result of the Poulsen and Constable Defendants' violations of the FDCPA as discussed herein, Plaintiff suffered concrete actual damages as described herein and is entitled to an award against the Poulsen and Constable Defendants, jointly and severally, for causing those damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2); and attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3).

<u>COUNT II</u>
**Utah Consumer Sales Practices Act**

112. Plaintiff hereby incorporates all other allegations set forth in this Complaint.

113. The Utah Consumer Sales Practices Act was enacted to "protect consumers from suppliers who commit deceptive and unconscionable sales practices" and to "recognize and protect suppliers who in good faith comply with the provisions of this act." Utah Code Ann. § 13-11-2.

19

114. Under its plain language the UCSPA "shall be construed liberally" to promote those policies. *Id.*

115. Deceptive or unconscionable conduct is prohibited by the UCSPA "whether it occurs before, during, or after the transaction." Utah Code Ann. §§ 13-11-4 and 13-11-5.

116. By engaging in the conduct described herein, each of the Defendants have violated the Utah Consumer Sales Practices by, among other things, knowingly or intentionally:

   a. Indicating that Sexton had an obligation to pay amounts that were not authorized by the contract or permitted by law,

   b. Falsely representing the character, amount, or legal status of the debt,

   c. Engaging in deceptive, harassing, and abusive conduct for the purpose of depriving Sexton of his legal rights and property,

   d. Falsely representing that Defendants had court approval for their actions,

   e. Falsely representing that Defendants had legal authority for their actions,

   f. Falsely representing the services rendered or compensation which may be lawfully received for the collection of a debt,

   g. Falsely representing they were entitled to payment of damages that were incurred only because of Defendants' other unlawful conduct,

   h. Forcibly removing Sexton and his family from their home when such conduct was not lawful,

i.  Unlawfully entering, photographing, and taking inventory of Sexton's property for the purpose of harassing, vexing, and intimidating Sexton, and to deprive Sexton of his property and legal rights,

j.  Unlawfully threatening to arrest Sexton and his family if he complied with the court's order and returned to the property,

k.  Interfering with the lawful sale of Sexton's home by unlawfully threatening to arrest the buyer of Sexton's home,

l.  Creating a situation in which Sexton was forced to pay rent even though he was forcibly prohibited from residing on or entering the premises,

m.  Forcibly interfering with Sexton's legal rights to comply with the courts orders,

n.  Falsely representing they were entitled to foreclosure when they were not,

o.  Falsely representing they were legally entitled to deprive the Sexton's of their ownership, possession, and use of their home and other property,

p.  Falsely representing they were legally entitled to sell Sexton's home and other property,

q.  Falsely representing that Sexton had no right to sell or remove his home from the premises,

r.  Falsely representing that the consumer transactions at issue involved other rights, remedies, or obligations that they do not,

s.  Falsely representing that the subject of the consumer transactions at issue had been supplied in accordance with a previous representation when they had not,

t.  Falsely representing that the legal framework at issue caused Sexton to waive or lose

certain claims or defenses or would otherwise become subject to unfair, misleading,

deceptive, or unconscionable conduct as a result of those proceedings,

u.  Charging Sexton for amounts that he did not actually incur, that were unreasonable,

unlawful, or not allowed by the applicable contract or law, and

v.  Charging Sexton for amounts that he did not previously agree to pay.

117.  As a result of each of Defendants' violations of the UCSPA, Plaintiff suffered the concrete

actual damages described herein and is therefore entitled to award against Defendants,

jointly and severally, for declaratory judgment, injunctive relief, for an award of actual and

punitive damages in an amount to be proven at trial, and for all other relief which Plaintiff

may be entitled.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests judgment against Defendants jointly and severally as

follows:

1.  For actual, statutory, and punitive damages as determined at trial;

2.  For an award of attorney's fees and costs reasonably incurred in this action;

3.  For pre-judgment and post judgment interest at the legal rates;

4.  For appropriate injunctive relief to prevent the Defendants from continuing to engage in the

fraudulent, deceptive, misleading, and unconscionable practices complained of herein;

5.  For leave to amend this Complaint as the interests of justice may allow; and

6.    For such other and further additional relief as may be determined to be appropriate and as

the Court may find just, equitable, and proper.

JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.


DATED 9/6/2017.                                    Eric Stephenson
                                                   Attorney for the Plaintiff